1   DONALD AMAMGBO, ESQ.
    AMAMGBO & ASSOCIATES
2   7901 Oakport Street, Suite 4900
    Oakland, California 94621
3   Telephone:  (510) 615-6000
    Facsimile:  (510) 615-6025
4

5   REGINALD TERRELL, ESQ.
    THE TERRELL LAW GROUP
6   223 25th Street
    Richmond, California 94804      E-filing
7   Telephone:  (510) 237-9700
    Facsimile:  (510) 237-4616
8

9   JUDITH BLACKWELL
    BLACKWELL & BLACKWELL
10  584 Valla Vista Avenue
    Oakland, California 94610
11  Telephone: 510-835-2848

12
13  Attorneys for Plaintiff

14

15                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
16

17

18  FAYUS INC. on behalf of itself and others          C 07 - 06276     B Z
    similarly situated,

        Plaintiff,                              CLASS ACTION COMPLAINT
                                                JURY TRIAL DEMANDED
20
        v.

    ARKANSAS BEST CORPORATION, FEDEX
22  CORPORATION, UNITED PARCEL
    SERVICES, INC., YRC WORLDWIDE INC.,
    OLD DOMINION FREIGHT LINE, INC.,
    SAIA, INC., AVERITT EXPRESS, INC., CON-
    WAY INC., JEVIC TRANSPORTATION,
    INC., SUN CAPITAL PARTNERS IV, LLC,
25  NEW ENGLAND MOTOR FREIGHT R+L
    CARRIERS, INC.,
26

27
                    Defendants.
28

                        CLASS ACTION COMPLAINT

1        Plaintiff FAYUS INC.. ("FI" or "Plaintiff"), individually and on behalf of a class of

2   those similarly situated, brings this action for damages and injunctive relief pursuant to the

3   antitrust laws of the United States against defendants FEDEX CORPORATION, UNITED

4   PARCEL SERVICES, INC., YRC WORLDWIDE INC., OLD DOMINION FREIGHT LINE,

5   INC., SAIA, INC., AVERITT EXPRESS, INC., CON-WAY INC., JEVIC

6   TRANSPORTATION, INC., SUN CAPITAL PARTNERS IV, LLC, NEW ENGLAND

7   MOTOR FREIGHT, and R+L CARRIERS, INC., demands a trial by jury and based upon

8   information and belief and the investigation of counsel, except for information based on personal

9   knowledge, alleges the following:

10   **NATURE OF THE ACTION**

11        1. Beginning June 2003 or earlier, and continuing to the present, defendants have

12   conspired to fix "fuel surcharges" for less-than-truckload truck shipments ("LTL"). Pursuant to

13   Rules 23(a), 23(b) and 23(b) (3) of the Federal Rules of Civil Procedure, Plaintiff seeks treble

14   damages, injunctive relief, attorney fees and costs under the antitrust laws of the United States of

15   America on behalf of itself and all others similarly situated.

16        2. This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C.

17   Sections 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys

18   fees against defendants for the injuries sustained by plaintiff and the class members, defined

19   herein, by reason of the violations, as hereinafter alleged, of the Sherman Act, 15 U.S.C. Section

20   1.

21        3. This action is also instituted to secure injunctive relief against defendants to prevent

22   them from further violations of Section 1 of the Sherman Act, as hereinafter alleged.

JURISDICTION AND VENUE

23

24        4. This court has diversity jurisdiction over the classes pursuant to 28 U.S.C. Section

25   1332(d)(2) and (6) because one or more class members defined herein are citizens of a state different

26   from one or more of the defendants and the aggregate amount in controversy exceeds five million

27   dollars ($5,000,000.00), exclusive of interest and costs.

28

1    5. Jurisdiction is further conferred upon this court by 28 U.S.C. Sections 1331 and 1337 and

2    by Sections 4 and 16 of the Clayton Act, 15 U.S.C. Sections 15 and 26.

3    6. Venue is proper in this district pursuant to sections 4, 12 and 16 of the Clayton Act, 15

4    U.S.C. Sections 15, 22 and 26 and 28 U.S.C. Section 1391(b), (c) and (d). Venue is proper in this

5    judicial district because during the class period one or more of the defendants resided, transacted

6    business, was found, and or had agents in this district and a substantial portion of the affected

7    interstate trade and commerce described below has occurred in this district.

8    7. Defendants maintain offices, have agents and or transact business within this judicial

9    district; a substantial part of the events giving rise to the claim for relief occurred in this district and

10   defendants regularly and continuously conduct business in interstate commerce that occurs in part in

11   this district.

12   8. This Court has in personam jurisdiction over defendants because, *inter alia,* each

13   defendant: (a) transacted business in the United States; (b) directly or indirectly sold and delivered

14   substantial quantities of LTL services throughout the United States; (c) had substantial aggregate

15   contacts with the United States as a whole; and/or (d) was engaged in an illegal price-fixing

16   conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities

17   residing in, located in, or doing business throughout the United States, including in this district.

18   Further jurisdictional facts as to certain foreign defendants are alleged below.

19                                    DEFINITIONS

20   9. As used herein, the term:

21       a.   "LTL" short for less-than-truckload," means the service of providing freight shipment,

22            for carriage by truck, when the freight to be shipped by a customer is less than a

23            truckload;

24       b.   "Person" means any individual, partnership, corporation, association and or other

25            business or legal entity; and

26       c.   "Class period refers to the period from July 2003 through the conclusion of the trial of

27            this litigation.

28

1      10. Plaintiff brings this action on behalf of itself and the members of the Damages Class

2   comprising:

3          All persons and or entities who paid a "fuel surcharge" on LTL service directly to defendants

4          and or their unnamed co-conspirators from July 30, 2003 through the conclusion of this

5          litigation. Excluded from the Class are federal government entities, the defendants, their co-

6          conspirators and their respective parents, subsidiaries and or affiliates.

7      11. Plaintiff further brings this action on behalf of itself and the members of the Injunctive

8   Relief Class comprising:

9          All persons and or entities that purchased LTL services directly and or indirectly from

10         defendants and or their unnamed co-conspirators. Excluded from the Class are federal

11         government entities, the defendants, their co-conspirators and or their respective parents,

12         subsidiaries and affiliates.

13     13. The Market definition in this action is the market for LTL service for shipments wholly

14   within North America and originating and or terminating in the United States. LTL shipments

15   nearly always weigh between 300 and 10,000 pounds. Excluded from this market definition are the

16   markets for shipments requiring at least one full truck, small package shipments, shipments of

17   furniture and personal effects by persons moving from one house to another, intermodal shipments

18   and shipments for carriage by air, water and or train.

19

20                                   **PARTIES**

21     14. Plaintiff FAYUS INC. ("FI" or "Plaintiff") is a corporation organized under the laws of

22   the State of California, with its principal place of business in Sacramento, California. FI purchased

23   LTL services indirectly from one and or more of the defendants during the class period and paid a

24   collusively set and imposed "fuel surcharge." The prices FI paid for LTL services were greater than

25   they would have been absent the conspiracy herein alleged resulting in injury to FI's business and

26   property.

27     15. Defendant ARKANSAS BEST CORPORATION ("ABC") has its headquarters at 3801

28   Old Greenwood Road, Fort Smith, Arkansas. ABC is a trucking conglomerate incorporated in

1 | Delaware offering LTL services under a variety of business names and wholly-owned alter-ego

2 | subsidiaries, including ABF, ABF Freight System, Inc., ABF Freight System Canada, ABF Cartage,

3 | Land-Marine Cargo, and FreightValue, Inc. ABF's headquarters is located at 3801 Old Greenwood

4 | Road, Fort Smith, Arkansas.

5 |     16. Defendant Saia, Inc. ("Saia") is a LTL company incorporated in Delaware. Saia's

6 | headquarters are located at 11465 Johns Creek Parkway, Suite 400, Duluth, Georgia.

7 |     17. Defendant FEDEX CORPORATION ("FEDX") provides packaging shipping and

8 | freight services, including LTL services, and operates FedEx Kinkos', among other business lines.

9 | FedEx is a Delaware corporation with its principal place of business in California. FedEx's

10 | headquarters is located at 942 South Shady Grove Road, Memphis, Tennessee.

11 |     18. Defendant UNITED PARCEL SERVICES, INC. ('UPS") is a freight, package delivery

12 | and supply chain management company incorporated in Delaware. UPS's headquarters is located at

13 | 55 Greenlake Parkway, NE, Atlanta, Georgia. UPS entered the LTL market by acquiring the assets

14 | of Overnite Transportation Company, then one of the largest LTL companies operating in the United

15 | States.

16 |     19. Defendant YRC WORLDWIDE INC. ("YRC") is a trucking company incorporated in

17 | Delaware providing LTL and other freight services using its own name and several other brand

18 | names. YRC is headquarters is located at 10990 Roe Avenue, Overland Park, Kansas.

19 |     20. Defendant OLD DOMINION FREIGHT LINE, INC. ("ODFL") is a Virginia

20 | corporation that derives most of its business from LTL service. ODFL's headquarters is located at

21 | 500 Old Dominion Way, Thomasville, North Carolina.

22 |     21. Defendant Jevic Transportation, Inc. ("Jevic") is a New Jersey corporation and major

23 | regional LTL services provider focusing on the Northeastern United States. Jevic's headquarters is

24 | located at 600-700 Creek Road, Delanco, New Jersey.

25 |     22. Defendant Sun Capital Partners IV, LLC ("Sun") is a private equity fund incorporated in

26 | Delaware that purchases companies in leveraged buyouts, or LBOs. defendant Sun purchased

27 | defendant Jevic from defendant Saia, Inc. in July 2006. defendant Sun's headquarters is located at

28 | 5200 Town Center Circle, Suite 470, Baca Raton, Florida.

CLASS ACTION COMPLAINT
4

1    23. Defendant New England Motor Freight, Inc. ("NEMF") is a regional LTL company

2 incorporated in New Jersey providing service in the Northeastern United States, Eastern Canada and

3 Puerto Rico. NEMF's headquarters is located at 1-71 Northern Avenue East, Elizabeth, New Jersey

4 07201.

5    24. Defendant R+L Carriers, Inc. ("RLC") is a privately-held LTL company, incorporated in

6 Ohio, with operations in 45 states, Canada and Puerto Rico. RLC operates under its own name and

7 under the names of R+L Transfer, Gator Freightways, Greenwood Motor Lines and Paramount

8 Transportation. RLC's headquarters is located at 600 Gillam Road, Wilmington, Ohio.

9    25. Defendant Con-way ("CW") provides LTL services, truckload brokerage, airfreight

10 forwarding, region asset based truckload service, transportation consulting and assembly and

11 distribution logistics programs for business to business supply cycle management. CW is

12 incorporated in Delaware and has its headquarters at 2855 Campus Drive, Suite 300, San Mateo,

13 California.

14    26. Defendant Averitt Express, Inc. ("AE") is a privately-held LTL company incorporated in

15 Tennessee with most of its operations concentrated in the southeastern United States, and additional

16 operations in selected cities. AE's headquarters is at Perimeter Place One, 1415 Neal Street,

17 Cookeville, Tennessee.

18                                **CO-CONSPIRATORS**

19    27. Various corporations and individuals not named as defendants in this Complaint

20 participated as co-conspirators in the anti-competitive conduct alleged herein and performed acts and

21 made statements in furtherance thereof.

22

23                                      **FACTS**

24    28. LTL services are used by Plaintiff and class members as a means to transport freight

25 within North America by ground. Plaintiff estimates, based on articles in trucking industry trade

26 journals, total domestic LTL industry revenue ranged from \$25 to \$35 billion annually during the

27 class period.

28

29. A number of structural characteristics of the LTL industry facilitate the implementation and maintenance of horizontal price-fixing:

a. LTL services are commodity products that are fungible in the sense that LTL services provided by any defendant are substitutable for the LTL services provided by any other defendant. LTL services are homogenous services sold by defendants and purchased by plaintiff and the class members primarily on the basis of price.

b. Demand for LTL services is imperfectly inelastic, meaning the gains from collusion are substantial.

c. The LTL serviced industry in the United States is highly concentrated facilitating coordination of prices. During the class period, defendants possessed a combined United States market share exceeding 75%.

d. There are substantial barriers to entry in the LTL industry requiring substantial time, resources and industry knowledge to even potentially overcome. Viable entry requires the purchase and or lease of hundreds of trucks and dozens of truck depots. Similarly, viable entry requires a new provider capture a significant market share from existing providers. Thus, entry is both expensive and risky. Entry is further restricted by the tight labor market for truck drivers. Current market participants face significant driver shortages. A potential competitor's entry into the market also would require significant advertising expenses to build a recognized brand name.

e. Even for potential shipping experts who possess the capital and know how to possibly enter the market, viable entry takes a long time. When package shipping leaders FedEx and UPS decided to enter the LTL market, they purchased and rebranded existing LTL companies rather than attempting to enter the market directly.

f. LTL services are a nondurable product. Unlike some industries, shippers cannot "stock up" on LTL services when prices are low and use this stockpile when shipping prices are high.

g. The cartel members all sell at the retail level of distribution as horizontal competitors.

h. Price is the most important competitive factor in LTL shipping and the standardized nature of LTL shipping services hinders substantial and material non-price competition.

i. The firms have a similar cost structure. In the LTL industry there is a high ratio of fixed to variable costs. Capital equipment, software, advertising, depot purchase and or ease, driver recruitment and training, and other capital costs are high relative to variable costs. None of the defendants are greatly more efficient than the industry average.

j. Newer industries are typically characterized by rapid growth, innovation and high profits. The LTL industry is a mature one, and like many mature industries, is characterized y slim profit margins, creating a motivation to collude.

k. The industry has a history of "cooperation." For example, several regional LTL companies have formed alliances with other regional LTL companies, with the claimed purpose of allowing nationwide service, but in fact with many more companies than would be required to offer such services. The level of cooperation within the trucking industry is higher than in similar industries, and has created a level of trust within the industry that has facilitated defendants' collusion.

l. The LTL industry has become increasingly concentrated. For example, in 2003 defendant YRC, then operating under the names Yellow Freight System and Yellow Transportation, merged with Roadway, then one of the largest LTL companies. The combined Yellow/Roadway entity then merged in 2005 with USF, another major LTL company, further increasing LTL market concentration.

m. Defendants are able to match each others' prices through publication of prices and because defendants frequently use identical pricing software.

n. During discussions of mergers and sales of assets from one defendant to another, defendants exchange non-public competitively sensitive financial information periodically allowing

1    them to audit and gauge their co-conspirators' compliance in imposing supra-competitive

2    "fuel surcharges."

3    30. Fuel cost is the single substantial variable defendants must cover that is subject to wide

4    variation in price. When a company's variable costs increase, without a concomitant offsetting

5    increase in demand, the profit of the company decreases as the company can only pass on a portion

6    of the cost increase to its customers.

7

8    31. Beginning in 2003, defendants, facing drastically increased fuel costs and the likelihood

9    of lower profits, have evaded this basis economic law by collusively imposing on their customers

10   "fuel surcharges," but which in fact bear little relation to the increase in their fuel costs. Higher fuel

11   costs in fact were merely the pretext and an opportunity for defendants to agree among themselves to

12   impose collusive "fuel surcharges."

13

14   32. Observers of the LTL industry, and indeed some of the defendants themselves, have

15   noted the direct relationship between high fuel prices and LTL profits. For example:

16

17   a.    A 2006 article in Traffic World, a weekly trade publication covering the transportation and

18         logistics industry, quoted Ken Hazen, president of transportation software and freight

19         payment from CTSi, as describing fuel surcharges as "a profit center now ... Carriers are in

20         control. They're in the catbird seat."

21   b.    A transportation industry analyst at Bear Stearns noted that: "Our sense is that generally the

22         LTL carriers make money on fuel surcharges and those earnings for LTL providers would be

23         hurt by sustained lower fuel costs."

24

25   c.    A 2005 article in Fleet Owner, a trade magazine for executives and managers of commercial

26         trucking fleets, noted that in the past increased fuel prices were harmful to the LTL industry,

27         but had become profitable during the recent period of increased prices: "High diesel fuel

28         prices usually signal harsh times for trucking .... That doesn't seem to be the case this year."

d.  Defendant ODFL frankly admitted in its 2006 annual report that higher fuel prices increase its profitability, and lower fuel prices decrease its profitability: "A rapid and significant decrease in diesel fuel prices would likely reduce our revenue and operating income until we revise our pricing strategy to reflect these changes."

e.  Defendant YRC also made this admission: "In general, under our present fuel surcharge program, we believe rising fuel costs are beneficial to us in the short term."

f.  Ad did defendant ABF:

As diesel fuel prices decline, the fuel surcharge and associated direct diesel fuel costs also decline by different degrees. Depending upon the rates of these declines and the impact on costs in other fuel and energy-related areas, operating margins could be negatively impacted. These admissions are in marked contrast to the domestic passenger airline industry. For example, Southwest Airlines noted:

The cost of fuel, which was at a historically high level over the last two years, is largely unpredictable and has a significant impact on the Company's results of operations .....

Due to the competitive nature of the airline industry, the Company's ability to increase fares is limited .........

33.  United Airline made the same observation:

At times, United has not been able to increase its fares when fuel prices have risen due to the highly competitive nature of the airline industry, and it may not be able to do so in the future ....

Higher fuel costs have had a significantly adverse effect on the Company's operating expenses in 2006 as compared to 2005.

34.  On December 15, 2004, the International Herald Tribune published an article headlined "Fuel costs wipe out airline profits despite travel rebound." The article noted:

1    The airline industry is experiencing huge growth worldwide, in a recovery from several rough

2    years after the September 11, 2001 terrorist attacks and regional problems like severe acute

3    respiratory syndrome, SARS. But the escalation in fuel prices produced another huge loss for

4    the industry this year.....

5

## OPERATION OF THE PRICE-FIXING CARTEL

6

7    35. When fuel prices began increasing in the early 2000s, LTL companies began imposing

8    increasingly high "fuel surcharges." These "fuel surcharges" were not set by the rate setting

9    organizations, and thus are beyond the scope of their former limited antitrust immunity.

10

11    36. Defendants agreed to impose identical and or nearly identical "fuel surcharges' by

12    agreeing to tie the "fuel surcharges" to an index of diesel fuel prices published to the public by the

13    United States Department of Energy ("Fuel Index"). Furthermore, to communicate movement of

14    prices and to police the cartel, each defendant lists its fuel surcharges on their web sites. As a result,

15    defendants' "fuel surcharges" move in lockstep.

16

17    37. Recently the Fuel Surcharge was near $3.00. At this price, defendants charged a "fuel

18    surcharge" ranging from 20.5% to 21.0%.

19    38. The amount of the "fuel surcharge" imposed by the LTL companies on shipping orders

20    exceeds the entire cost of fuel for delivering the freight of most customers and vastly exceeds the

21    increase in fuel prices since the "fuel surcharge" was imposed.

22

23    EFFECT

24    39. The unlawful contract, combination and or conspiracy alleged above had, inter alia, the

25    following effects:

26

27    a. Prices charged by defendants and their co-conspirators to Plaintiff and the class members for

28        LTL services were maintained at artificially high and noncompetitive levels; and

CLASS ACTION COMPLAINT
10

b.  Plaintiff and the class members were required to pay more for LTL services than they would have paid in a competitive marketplace unfettered by defendants' and their co-conspirators' collusive and unlawful price-fixing.

40.  During and throughout the period of the contract, combination and or conspiracy alleged herein, Plaintiff and the class members directly purchased LTL services in the United States.

41.  Plaintiff and the class members paid more for LTL than they would have paid under conditions of free and open competition.

42.  Because of the illegal contract, combination and or conspiracy alleged herein, Plaintiff and the class members were injured and financially damaged in their businesses and property, in amounts which are not presently known but in excess of the amount necessary for the jurisdiction of this court.

## CLASS ACTION ALLEGATIONS

43.  Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

44.  Plaintiff brings this action on behalf of itself and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b) (2) and 23(b) (3).

45.  Plaintiff does not know the exact size of the Class, since such information is in the exclusive control of the defendants.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that the Class is so numerous and geographically dispersed throughout the United States as to render joinder of all Class members impracticable.  Plaintiff further believes the member of the Class can be readily ascertained from defendants' books and records.

46.  There are questions of law and fact common to the classes.  These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof.  The questions include but are not limited to:

1          a.   Whether defendants and their co-conspirators engaged in a combination and

2               conspiracy among themselves to fix, raise, maintain and or stabilize fuel surcharges

3               imposed for LTL services sold in the United States;

4          b.   The identity of participants in the conspiracy;

5          c.   The duration of the conspiracy alleged in this complaint and the nature and character

6               of the acts performed by defendants and their co-conspirators in furtherance of the

7               conspiracy;

8          d.   Whether the alleged conspiracy violated Section 1 of the Sherman Act;

9          e.   Whether the conduct of defendants and their co-conspirators, as alleged in this

10              complaint, caused injury to the business and property of plaintiff and the class

11              members;

12         f.   The effect of defendants' conspiracy on the prices of LTL services sold in the United

13              States during the class period; and

14         g.   The appropriate measure of damages sustained by plaintiff and the damage class

15              members.

16         47.  These and other questions of law and fact are common to the Class, and predominate

17    over any questions affecting only individual Class members.

18         48.  Plaintiff is a member of both classes.  Its claims are typical of the claims of other class

19    members; plaintiff will fairly and adequately protect the interests of the members of the Class and

20    have retained counsel competent and experienced in the class action and antitrust litigation.

21         49.  A class action is superior to other available methods for the fair and efficient

22    adjudication of this controversy since joinder of all Class members is impracticable.  The

23    prosecution of separate actions by individual members of the Class would impose heavy burdens

24    upon the courts and defendants and would create a risk and or inconsistent and or varying

25    adjudications of the questions of law and fact common to the Class.  A class action would achieve

26    substantial economies of time, effort, and express and would assure uniformity of decision as to

27    persons similarly situated without sacrificing procedural fairness and or bringing about other

28    undesirable results.

ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

50. The unlawful conduct, combination and or conspiracy alleged herein had and are having the following effects, among others:

a.      The prices paid by Plaintiff and the Class for unregulated rail freight transportation services were fixed and or stabilized at supra-competitive levels;

b.      The Rail Fuel Surcharges charged to Plaintiff and the Class for unregulated rail freight transportation was been fixed and or stabilized at supra-competitive levels;

c.      Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation; and

d.      Competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

51. By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the members of the Class have sustained injury to their business and or property. The injury sustained by the plaintiff and the Class is the payment of supra-competitive prices for unregulated rail freight transportation as a result of defendants' illegal contract, combination, and conspiracy to restrain trade as alleged.  This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

COUNT I
(Violation of § 1 of the Sherman Act and § 4 of the Clayton Act)

52. Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

53. Defendants entered into and engaged in a contract, combination, and or conspiracy in unreasonable restraint of trade in violation

54. The contract, combination, and or  conspiracy resulted in an agreement, understanding and or  concerted action between and among defendants in furtherance of which defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation.  Such

1  contract, combination, and or conspiracy constitutes a per se violation of the federal antitrust

2  laws and is, in any event, an unreasonable and unlawful restraint of trade.

3       55. Defendants' contract, combination, agreement, understanding, and or concerted

4  action occurred within the flow of, and substantially affected, interstate and international

5  commerce. Defendants' unlawful conduct was through mutual understandings and or

6  agreements by, between and among defendants.

7       56. The contract, combination and or conspiracy have had the following effects:

8          a.  Prices charged to Plaintiff and the Class for unregulated rail freight

9  transportation services were fixed and/or maintained at supra-competitive levels;

10          b.  Prices charged to Plaintiff and the Class for Rail Fuel Surcharges applied to

11  unregulated rail freight transportation were fixed and/or maintained at supra-competitive

12  levels;

13          c.  Plaintiff and the Class have been deprived of the benefits of free, open and

14  unrestricted competition in the market for rail freight transportation services; and

15          d.  Competition in establishing the prices paid, customers of, and territories for

16  rail freight transportation services has been unlawfully restrained, suppressed and

17  eliminated.

18       57. Because of defendants' unlawful conduct, Plaintiff and the Class have suffered

19  injury in that they have paid supra-competitive prices for unregulated rail freight transportation

20  services during the class period.

21       WHEREFORE, Plaintiff prays for relief as follows:

22

23     A.    That the Court determine that this action may be maintained as a class action
under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that
24  Plaintiff be denominated as class representative, and that Plaintiff's counsel be
appointed as counsel for the Class;

25
   B.    That the unlawful contract, combination, and conspiracy alleged in Count I be
26  adjudged and decreed to be an unreasonable restraint of trade and or commerce
in violation of Section 1 of the Sherman Act;
27

28     C.    That Plaintiff and the Class recover compensatory damages, as provided by law,
determined to have been sustained as to each of them, and that judgment be

1    entered against defendants on behalf of Plaintiff and each and every member of
     the Class;

2

D.    That each of the defendants' respective officers, directors, agents, and employees,
3          and all other persons acting on behalf of and or in concert with them, be
          permanently enjoined and restrained from, directly and or indirectly, continuing
4          and or maintaining the combination, conspiracy, and or agreement alleged in this
          case;

5

6    E.    That Plaintiff and the Class recover treble damages, as provided by law;

7    F.    That Plaintiff and the Class recover their costs of the suit, including attorney's
          fees, as provided by law; and

8

9    G.    For such further relief as the Court may deem just and proper.

10

     Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury
11
     trial as to all issues friable by a jury.
12

13   Dated: December 10, 2007

                                        By: _____
14                                          DONALD AMAMGBO, ESQ.
                                            AMAMGBO & ASSOCIATES
15                                          7901 Oakport Street, Suite 4900
                                            Oakland, California 94621
16                                          Telephone: (510) 615-6000
                                            Facsimile: (510) 615-6025
17

18                                          REGINALD TERRELL, ESQ.
                                            THE TERRELL LAW GROUP
19                                          223 25th Street
                                            Richmond, California 94804
20                                          Telephone: (510) 237-9700
                                            Facsimile: (510) 237-4616
21

22                                          JUDITH BLACKWELL
                                            BLACKWELL & BLACKWELL
23                                          584 Valla Vista Avenue
                                            Oakland, CA 94610
24                                          Telephone: 510-835-2848

25

26

27

28